UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Universal Electric Products Co., Inc.,

     Plaintiff,

v.                                 Case No. 06-15254

Emerson Electric Co.,                Honorable Sean F. Cox

     Defendant.
_____/

## OPINION & ORDER

     This action arises out a failed distributor relationship between the parties.

Plaintiff/Counter-Defendant Universal Electric Products Co., Inc. ("Universal") asserts four

claims against Defendant/Counter-Plaintiff Emerson Electric Co. ("Emerson") and Emerson

asserts three counterclaims against Universal. This matter is currently before the Court on the

following three motions: 1) Emerson's Motion for Summary Judgment seeking summary

judgment as to each of Universal's four claims against it; 2) Emerson's Motion for Partial

Summary Judgment, seeking summary judgment as to two of its counterclaims; and 3)

"Plaintiff's Motion to Clarify the Applicable Law that Shall Govern Plaintiff's Claim for

Recovery of Punitive Damages." The parties have fully briefed the issues and the Court heard

oral argument on March 27, 2008.

     As explained below, with respect to Emerson's Motion for Summary Judgment seeking

dismissal of Universal's claims, the Court shall : 1) grant the motion with respect to Plaintiff's

Breach of Contract claim and dismiss that claim because the unambiguous language of the

contract does not prohibit Emerson from selling directly or raising its prices; 2) grant the motion with respect to Plaintiff's claim for "Tortious Interference with Contractual Relationships" (Count II) because Plaintiff cannot identify a valid contract that Defendant interfered with; 3) grant the motion with respect to Plaintiff's Tortious Interference with Economic Relations claim (Count III) because Plaintiff cannot establish that Defendant lacked justification in making direct sales; and 4) deny the motion with respect to the Robinson-Patman claim, and allow Plaintiff to amend its complaint to properly allege the product market at issue.

With respect to Emerson's Motion for Partial Summary Judgment seeking summary judgment on two of its counterclaims, the Court shall grant the motion in part and deny the motion in part. The motion shall be granted to the extent that the Court will rule that Universal owes Emerson the following amounts: 1) $201,708.22 for product that it received (Count II, Open Account claim); and 2) at least $64,835.41 for unreturned consigned goods (Count III, Breach of Consignment Agreement claim). The motion shall be denied with respect to Emerson's request for attorney fees and the motion shall be denied with respect to Emerson's request for $9,530.15 for returned consigned goods because there is an issue of fact as to their condition upon being returned.

Finally, with respect to Plaintiff's Motion for Clarification of the law that would apply to its request for punitive damages as to its tort and contract claims, that motion shall be denied as moot because the Court is dismissing Plaintiff's contract and tort claims.

## BACKGROUND

A.     Procedural Background:

Universal filed this action against Emerson on November 27, 2006. The matter is in this

Court based on diversity jurisdiction. Universal's Second Amended Complaint, which includes a jury demand, asserts the following four claims against Emerson: "Breach of Agreement" (Count I); "Tortious Interference with Contractual Relationships" (Count II); "Tortious Interference with Economic Relations" (Count III); and "Violation of Robinson-Patman Act" (Count IV).

Emerson, in turn, has asserted the following three counterclaims against Universal: "Breach of Contract - the Agreement" (Count I); "Open Account" (Count II); and "Breach of Contract - Consignment Agreement" (Count III). (*See* Docket Entry No. 19).

This matter is currently before the Court on the following 3 motions:

- Universal's "Motion to Clarify the Applicable Law that Shall Govern Plaintiff's Claim for Recovery of Punitive Damages" (Docket Entry No. 61), wherein Universal asks the Court to declare that Missouri law shall govern the dispute with respect to its claim for recovery of punitive damages.

- Emerson's Motion for Summary Judgment (Docket Entry Nos. 63 & 64), wherein Emerson asserts that it is entitled to summary judgment on each of Universal's claims against it.

- Emerson's Motion for Partial Summary Judgment (Docket Entry No. 65), wherein Emerson asserts that it is entitled to judgment as a matter of law on its Action on Account counterclaim and its counterclaim for Breach of the Consignment Agreements.

B.    Factual Background:

Universal is a Michigan corporation with its principal place of business in Howell, Michigan. (Pl.'s Second Am. Compl. at ¶ 1). For more than thirty years, Universal has been a distributor of motors and related products to automotive original equipment manufacturers and suppliers ("OEM Market") throughout the mid-west, including Ohio and Michigan. (*See* Beaton Affidavit, attached as Exhibit 1 to Pl.'s Response).

Emerson, a Missouri corporation with its principal place of business in Missouri, is a

manufacturer of electrical products, including motors, gears and drives.

In 1984, Universal and Emerson entered into a broad-line distributor agreement. (Pl.'s Second Am. Compl. at ¶ 5; Def.'s Answer to same).

<u>The Written Agreement Between The Parties</u>:

In 1990, Universal and Emerson entered into a new distributor agreement ("the Agreement"). (*Id.*). The Agreement is attached to Def.'s Motion as Exhibit A. The Agreement provides that Emerson appointed Universal "as a **non-exclusive** authorized Distributor in the Market Area of the following products manufactured and/or sold by" Emerson: Motors, Gears and Drives, Electrical Adjustable Speed Drives, and Replacement Parts. (Agreement at 1)(emphasis added). The Agreement states that it "shall be governed by, and construed in accordance with, the laws of the State of Missouri." (*Id*. at 1).

The Agreement provides that Emerson "**reserves the right from time to time to revise the price of Products**, its terms and conditions of sale, and to modify, discontinue or add new Products to those listed above **and any such action shall not form the basis of any claim by Distributor against [Emerson]**." (*Id*.)(emphasis added). The Agreement also provides that it "may be terminated and cancelled at any time with or without cause by [Emerson or Universal] by giving sixty (60) days written notice to the other party." The Agreement states that:

> This Agreement supercedes and cancels all previous written or verbal quotations, arrangements, understandings, or agreements. Other than as expressly stated herein, **nothing in this Agreement shall be construed as granting any exclusive distributorship or rights to [Universal] in the Market Area or any rights in any other geographical area or preventing [Emerson] from freely operating or appointing other Distributors in the Market Area or other geographical area**, or as authorizing the Distributor to make any representations, guarantees or warranties with respect to the goods herein authorized to be sold or to make any commitment on behalf of [Emerson], except to the extent that the

Distributor shall have been granted express written authority to do so.

(Agreement at 1)(emphasis added).  It also states that:

> The parties agree that (I) nothing in this Agreement or performance of this Agreement by [Universal] shall be construed to give [Universal] any vested or proprietary rights in the Market Area concerning the Products, (ii) any good will built up by [Universal] in connection with sale or distribution of Products or advertising thereof is exclusively the property of [Emerson]; (iii) any money or effort expended by either [Emerson or Universal] are expended with knowledge that this Agreement may be terminated by either party as set forth herein, and [Universal] waives any claim upon [Emerson] with respect to its investment in advertising or otherwise in anticipation of the continuation of this Agreement and any oral statement to the contrary by an agent or employee of [Emerson] is unauthorized and shall not be binding on [Emerson].

(Agreement at 2).  The Agreement also provides that it "may not be altered or modified except in writing and duly executed by authorized representatives of both parties."  (*Id.*).

<u>Other Communications Between The Parties</u>:

Beaton's Affidavit states that "UEP and Emerson always operated under the explicit understanding that the Distributorship Agreement flatly prohibited Emerson from making such direct sales."  (Beaton Affidavit, attached as Ex. 1 to Pl.'s Br., at ¶ 5).  He further states that upon learning that Emerson made a sale to Mann & Hummel, he "vehemently objected to Emerson personnel because Emerson's conduct non only violated the Distributorship Agreement but it improperly took advantage of strategic pricing and customer information."  (*Id.* at ¶ 6).

In relation to that issue, in a letter dated August 20, 2001, Emerson representative Gary Sajewich ("Sajewich") stated as follows to Universal representative Jeff Beaton:

> Confirming our discussion today relative to Mann & Hummel, actions and communications as follows:
>
> •   Emerson Motors will credit Universal Electric 5% of the order received from Mann & Hummell for the Townswando GM project upon receipt of

payment from Mann & Hummell.  This will apply to all orders received for this project given to us from Mann & Hummell over the next 18 months.

- In order to avoid future issues, Universal Electric will supply Emerson Motors a listing of the OEM's that you supply significant Emerson Motors product.  This list will be reviewed by Emerson Motors management **to assess our commitment not to pursue these accounts on a direct basis**. If we have issues with any accounts we will call to discuss.  We will sign confidentiality agreements for the account information.

Jeff, we appreciate the time taken to discuss this issue and look forward to strengthening our business relationship.  Please call me if you have any questions or require further information.

(Ex. 7 to Pl.'s Br.)(emphasis added).

Emerson Increases Prices To Universal In 2006:

It is undisputed that while the Agreement was in place, Emerson raised the prices it was charging to Universal for Emerson motors in February of 2006.  Some of the increases were significant.  Universal maintains that Emerson did not need to raise the prices it charged to Emerson, and did so to execute a secret plan to sell directly to Universal's customers.  It contends that Exhibit 10 shows this plan.

Universal contends that the price increases were so substantial that it would be nearly impossible for it to sell Emerson motors to its OEM customers.  Universal was, however, already selling motors by other manufacturers at this time.

Rather than buy motors from Universal that are made by other manufacturers, after the price increase, it is undisputed that Great Lakes and Process Systems approached Emerson to buy Emerson motors directly from Emerson.

Emerson then sold directly to Great Lakes and Process Systems, which Universal

maintains are two of its "most significant OEM customers," (Pl.'s Response Br. at 8), at a price that was lower than the increased prices given to Universal.

Emerson Terminates The Agreement In November, 2006:

In a letter dated November 28, 2006, Emerson advised that it was terminating the Agreement. (Ex. D to Def.'s Motion). That letter stated, in pertinent part, as follows:

> This is to advise you that effective 11/27/06 your appointment as a non-exclusive authorized distributor for [Emerson] is terminated. This termination is based on your violation of the Distributorship Agreement between [Emerson and Universal] dated February 12, 1990 ("Agreement"), specifically your cessation of actively promoting the sale and distribution of [Emerson] products in the market, your failure to timely pay for product purchased by [Universal from Emerson] per the agreed upon payment terms and your failure to make payments against the past due receivable balance as you agreed upon.

(*Id.*).

Standard of Decision

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

I.  <u>Emerson's Motion For Summary Judgment Seeking Summary Judgment As To Universal's Claims.</u>

In this motion, Emerson seeks summary judgment as to each claim that Universal has asserted against it.  Each ground will be addressed in turn.  Both parties analyzed all issues relating to this motion exclusively under Missouri law.

    A.  <u>Universal's Breach Of Contract Claim (Count I).</u>

Emerson contends that it is entitled to judgment as a matter of law on Universal's breach of contract claim.  Emerson notes that it appears that the breach of contract claim is based on Universal's allegation that Emerson sold products to Universal's customers, thus depriving it of sales which it was entitled to make under the agreement.  Emerson contends that claim fails as a matter of law because the Agreement is unambiguous and simply did not grant Universal an exclusive right to sell Emerson's products and in no way restricted Emerson's right to sell its own products.  Emerson states that "[s]imply put, the distributorship agreement did not grant UEP an exclusive right to sell Emerson products and in no way restricted Emerson's right to sell its own products.  Accordingly, Emerson did not breach the Agreement by making sales in competition with UEP when customers asked to buy direct from Emerson."  (Def.'s Br. at 10).

Emerson's opening brief does not discuss the issue of whether any subsequent agreements were entered into by the parties that altered the contract on the issue of whether Emerson could sell products directly to Universal's customers, presumably because the complaint only references one contract, the written distributorship agreement, and does not reference any subsequent agreements or amendments.

8

Universal's response to this ground for relief is three part: 1) it asserts that even if the Agreement permitted Emerson to sell directly to Universal's customers, the parties subsequently modified the agreement as to that issue; 2) it asserts that Emerson also violated the covenant of good faith and fair dealing; and 3) it asserts that the Agreement does not permit Emerson to sell directly to Universal's OEM customers.

Universal first asserts that, even if the agreement did not restrict Emerson from selling to Universal's customers, the parties modified the contract to include such a prohibition. Universal contends that "it is undisputed that in 2001, UEP complained regarding Emerson's improper direct sale to Mann & Hummel (M&H). In response, Emerson paid UEP and committed, in writing, not to pursue UEP's OEM accounts on a direct basis. Accordingly it contends that even if the Distributorship Agreement did not prevent Emerson from directly selling to UEP's OEM customers', the parties effectively modified this provision." (Pl.'s Resp. at 10-11).

Universal's position is based upon the August 20, 2001 letter from Sajewich, which it characterizes as a written commitment not to sell directly to Universal's customers. It is also based on the testimony of Aune, which Plaintiff characterizes as testimony that "by executing the 2001 Letter Agreement, Emerson committed that it 'would not pursue direct business that we were servicing through Universal.'"

With respect to its good faith and fair dealing argument, Universal cites various statements from cases speaking of the covenant of good faith and fair dealing in contracts. It then asserts, without citation of any cases with analogous facts, that there can be no doubt that Emerson breached its obligations and abused its power by implementing a "secret plan to eliminate UEP and take its business." It contends that a genuine issue of material fact exists with

respect to whether Emerson, through its conduct, breached the covenant of good faith and fair dealing by evading the spirit of the transaction and denying UEP its expected benefits."  (Def.'s Br. at 12).

Finally, Universal's brief contends that the Distributorship Agreement itself prohibits direct sales.  It argues that there is no provision in the agreement that gives Emerson the right to make direct sales to customers.[1]  It takes the position that the agreement is "silent" on the issue of whether or not Emerson can make direct sales to customers and it is therefore ambiguous because it is capable of different meanings.  It contends the language indicating Emerson can "freely operate" in the market is "designed to convey the idea that UEP is being granted a non-exclusive distributorship and that Emerson, in turn, will also be able to appoint other distributors and conduct business in the area."  (Pl.'s Br. at 13).  It contends that "a reasonable person reading this provision would certainly be justified in concluding that while Emerson was permitted to conduct business, it would not be permitted to directly sell to customers already being serviced by UEP."  (*Id*.).  Universal then asserts that once the Court determines that the contract is ambiguous, it should look outside the four corners of the contract and consider external factors such as the parties' course of performance.

In its Reply Brief, Emerson contends that the modification argument fails for two reasons.  First, under Missouri law, a modification of a contract is enforceable only if supported by consideration and Universal cannot show any consideration here.  *Meco Sys., Inc. v. Dancing Bear Entertainment, Inc*., 42 S.W.3d 794, 803-804 (Mo. Ct. App. 2001).  Second, it contends

---

[1]Although at oral argument, Universal's counsel acknowledged that no specific provisions in the contract prohibit Emerson from selling directly or raising the prices it charged to Universal.

that the August 20, 2001 Letter did not modify the Agreement in any event because the letter, by its terms, is "clearly an offer to consider such an agreement after UEP provided Emerson with a list of accounts." (Def.'s Reply at 2). Emerson submits the affidavit of Sajewich, the author of the August 20, 2001 letter, who states that while Universal demanded written assurance that Emerson would not compete with Universal for future sales to OEM's, Emerson would not agree to that. Rather, Sajewich states that he told Beaton that if Universal gave it a list of its OEMs where Universal had significant sales of Emerson products, Emerson would "review and assess" a commitment not to pursue those accounts on a direct basis. (Sajewich Affidavit, attached as Ex. 2 to Def.'s Reply Br.).

Sajewich also states that at this time he sent Beaton a confidentiality agreement, which is attached to his affidavit, that confirms what he told Beaton. He states the agreement made it clear that Emerson retained the right to solicit business from OEM's, including any OEM's that Universal listed as their customers and stresses the following language:

> NOT A MARKET SHARING AGREEMENT OR AGREEMENT NOT TO SOLICIT: **For the sake of clarity, Emerson is not agreeing to avoid soliciting business from OEM's which may be listed by Universal Electric as an existing account**. However, Emerson will not use the Confidential Information provided by Universal Electric for any purpose other than to reduce the frequency that Emerson - Speciality Motors spends resources and personnel time soliciting business from OEM accounts that presently purchase a significant number of compatible Emerson - Industrial Solutions motors distributed to the OEMs by Universal Electric.

(Ex. 2 to Def.'s Br.)(emphasis added). Emerson emphasizes that although that confidentiality agreement was never signed by the parties, Beaton testified that it accurately reflected his conversations with Emerson. (*See* Beaton Tr. at 66-67).

Emerson also asserts that the implied covenant of good faith and fair dealing "cannot give

11

rise to new obligations not otherwise contained in a contract's express terms." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996)(citing *Glass v. Mancuso*, 444 S.W.2d 467, 478 (Mo. 1969)). Emerson contends that Universal is essentially asking the Court to rewrite the contract and make Universal an exclusive distributor, an argument that was made and rejected in *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404 (Mo. Ct. App. 1996).

The Court agrees that Emerson is entitled to summary judgment with respect to Universal's breach of contract claim.

With respect to basic principles involving contract interpretation, Missouri law is the same as Michigan law. "In interpreting a contract, 'a court will seek to ascertain the intent of the parties and to give effect to that intent.'" *Byrd v. Frank B. Wilson Trust*, 182 S.W.3d 701, 706 (Mo. Ct. Apps. 2006)(internal citation omitted). The intent of the parties to a contract is presumed to be expressed by the ordinary meaning of the contract's terms. *Id.* If a contract's language is not ambiguous, it must be enforced as it is written. *Id.* In other words, "[w]hen a contract's language is clear, we discern the parties' intent from the document alone" and do not apply rules of construction. *Bailey v. Federated Mutual Ins. Co.*, 152 S.W.3d 355, 357 (Mo.App. 2004).

Whether language is ambiguous is a question of law. *Bailey, supra.* In determining whether language is ambiguous, the Court must "examine the entire contract and apply meanings a person of average intelligence and education would understand." *Id.* Language is ambiguous only if it is reasonably open to different constructions. *Id.*

The Court concludes that the language in the Distributorship is unambiguous and therefore must be enforced as written without resorting to any rules of construction. Specifically,

the 1990 Distributorship Agreement:

- Provides that Emerson appointed Universal "as a **non-exclusive authorized Distributor**"of the following products manufactured and/or sold by" Emerson: Motors, Gears and Drives, Electrical Adjustable Speed Drives, and Replacement Parts. (Agreement at 1)(emphasis added).

- Provides that Emerson "**reserves the right from time to time to revise the price of Products**, its terms and conditions of sale, and to modify, discontinue or add new Products to those listed above and **any such action shall not form the basis of any claim by Distributor against [Emerson]**." (*Id.*)(emphasis added).

- Provides that it "may be terminated and cancelled at any time with or without cause by [Emerson or Universal] by giving sixty (60) days written notice to the other party."

- States that "This Agreement supercedes and cancels all previous written or verbal quotations, arrangements, understandings, or agreements. Other than as expressly stated herein, **nothing in this Agreement shall be construed as granting any exclusive distributorship or rights to [Universal] in the Market Area or any rights in any other geographical area or preventing [Emerson] from freely operating or appointing other Distributors in the Market Area or other geographical area.**" (Agreement at 1).

- States that "The parties agree that (I) **nothing in this Agreement or performance of this Agreement by [Universal] shall be construed to give [Universal] any vested or proprietary rights in the Market Area concerning the Products**, (ii) any good will built up by [Universal] in connection with sale or distribution of Products or advertising thereof is exclusively the property of [Emerson]; (iii) any money or effort expended by either [Emerson or Universal] are expended with knowledge that this Agreement may be terminated by either party as set forth herein, and [Universal] waives any claim upon [Emerson] with respect to its investment in advertising or otherwise in anticipation of the continuation of this Agreement and any oral statement to the contrary by an agent or employee of [Emerson] is unauthorized and shall not be binding on [Emerson]." (Agreement at 2)(emphasis added).

- The Agreement also provides that it "may not be altered or modified except in writing and duly executed by authorized representatives of both parties." (*Id.*).

Thus, under the plain and unambiguous language of the contract, Emerson is not precluded from directly selling its products, or raising the prices it charges to Emerson, and the Court must enforce the contract as written. The Court therefore rejects Universal's contention

that the Distributorship Agreement prohibits direct sales or prohibits Emerson from raising the prices it charges to Universal.

Universal's good faith and fair dealing argument fares no better. Missouri law "does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to a new obligation not otherwise contained in a contract's express terms." *Comprehensive Care Corp. v. Rehabcare Corp.*, 98 F.3d 1063, 1066 (8tth Cir. 1996)(citing *Glass v. Mancuso*, 444 S.W.2d 467, 478 (Mo. 1969)). Universal's good faith and fair dealing argument fails because it is an attempt to extend the contract beyond its express terms and such a strategy "is not allowed under Missouri law." *Adbar Co., L.C. v. PCAA Missouri, LLC*, 2008 WL 68858 (E.D. Mo. 2008).

Finally, the Court must consider Universal's assertion that the parties subsequently modified the contract. This argument also fails because there is insufficient evidence upon which a reasonable jury could conclude that the parties entered into a contract modification that bars Emerson from direct sales. The August 20, 2001 letter does not, by its terms, set forth an agreement not to sell directly to Universal's customers. Moreover, Beaton testified that the confidentiality agreement forwarded by Emerson during this time period, which contains the following language, accurately reflected the parties' discussions on the issue:

> For the sake of clarity, Emerson is not agreeing to avoid soliciting business from
>
> OEM's which may be listed by Universal Electric as an existing account.

(Ex. 2 to Def.'s Br.; *see also* Beaton Tr. at 66-67).

Accordingly, Emerson is entitled to summary judgment with respect to Universal's breach of contract claim.

B.    Universal's Tortious Interference Claims (Counts II & III).

Count II is titled "Tortious Interference with Contractual Relationships," while Count III

is titled "Tortious Interference with Economic Relations."    Under Missouri law, tortious

interference with a contract or business expectancy requires proof of the following: 1) a valid

contract or business expectancy; 2) defendant's knowledge of the contract or relationship; 3) a

breach induced or caused by defendant's intentional interference; 4) absence of justification; and

5) damages.  *Rice v. Hodapp*, 919 S.W.2d 240, 245 (1996).

1.    Does Count II Fail Because No Contract With Twin City Existed?

Defendant claims that it learned during discovery that Universal's claim for interference

with contractual relationships is based upon an alleged contractual relationship with Twin City

Fan Companies, Ltd. ("Twin City") in June of 2006 for the sale of Emerson products and that

Emerson tortiously interfered with that contract.  Emerson contends it is entitled to summary

judgment on Count II because Universal does not have contracts with any of its customers and

did not have a contract with Twin City in June of 2006.  (Def.'s Br. at 10-11).  Emerson supports

this argument with the following deposition testimony of Beaton:

> Q.    Does Universal have contracts with any of its customers?
> A.    No, not specifically.  By the word of a blanket agreement or something
>       like that?
> Q.    Yes.
> A.    No, sir.
> Q.    Your products are sold on a job or a transactional basis?
> A.    Correct.

(Def.'s Ex. E, Beaton Tr. at 161).  It notes that despite that testimony, one of Universal's

interrogatory answers appears to allege that a contract with Twin City existed.  (*See* Ex. K to

Def.'s Br. at 4).  Emerson states that to the extend that Universal asserts that the purchase order

15

from Twin City constitutes a "contract" that position is without merit because the express terms of the purchase order stated that it becomes a binding contract only when it is accepted by the seller either by acknowledgment or performance. (Ex. K at 5). It maintains that under the unambiguous terms of the purchase order, UEP and Twin City never entered into a contract because Universal never accepted the terms.

Universal responded to this argument only in a footnote, asserting that there may have been a contractual agreement with Twin City in the form of an offer (quotation) and acceptance (purchase order). Nevertheless, at oral argument, Universal's counsel explained that under Missouri law the two torts (tortious interference with a contractual relationship and tortious interference with business expectancy) are merged into one claim. He indicated that Universal included Counts II and III because that issue was not clear at the time the complaint was filed. He further indicated that Universal's tort claim is based upon a business expectancy – not a contractual relationship.

Accordingly, the Court concludes that Count II should be dismissed.

2.      Can Plaintiff Establish That Emerson Lacked Justification In Making Direct Sales To Great Lakes Pump And Process Systems?

As stated *supra*, one of the essential elements of a tortious interference claim is that the defendant "lacked justification" for taking the challenged actions.

Emerson asserts that Universal cannot establish that it lacked justification in making direct sales to Great Lakes Pump and Process Systems. It contends it had a legitimate economic interest in making sales to, and protecting its relationship with, Great Lakes and Process Systems. It notes that the Agreement did not give Universal an exclusive right to sell Emerson products

16

and did not restrict Emerson from selling direct or raising the prices it charges to Universal.

In response, Universal asserts that "[t]he evidence establishes that Emerson **directly sold to customers to whom it promised it would not sell** at prices that were far lower that [sic] it was charging UEP (based on the false claim that it needed to raise prices to merely 'breakeven' on UEP's sales). In doing so, Emerson severely damaged UEP's credibility because UEP was insisting to its customers that it needed to sell at higher prices while, at the same time, these customers learned from Emerson that it was willing to sell these products at levels far below that which UEP claimed. Once UEP's credibility was shot, its customers left in droves; and prospective customers shied away. Emerson did all this while still telling UEP that it wanted to continue the parties' relationship, a clear ploy to prevent UEP from attempting to maintain its relationship while Emerson transitioned the business." (Pl.'s Br. at 16). Universal relies mainly on *Machine Maint. & Equip. Co. v. Cooper Indus., Inc.*, 661 F.Supp. 1112, 1116 (E.D. Mo. 1987).

The Court agrees that Emerson is entitled to summary judgment on the remaining tort claim.

"Under Missouri law a plaintiff has the burden of producing substantial evidence to establish the absence of justification." *Community Title Co. v. Roosevelt Federal Savings and Loan Assoc.*, 796 S.W.2d 369, 372 (1990). In that case, the Court explained:

> It is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and seeks not only to further his own interests, but in doing so employs improper means. *Friedman v. Edward L. Bakewell, Inc.*, 654 S.W.2d 367, 370 (Mo.App. 1983). But there is no impropriety of self-interested interference when a defendant has a legitimate interest in the contract or expectancy. *Id.*

*Community Title Co., supra*, at 372.

"If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (2006). "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id.*

"No liability arises for interfering with a contract or business expectancy if the action complained of was an act which the defendant had a definite legal right to do without any qualification." *Community Title Co., supra*, at 372.

Here, Emerson's contract with Universal did not give Universal an exclusive right to sell Emerson products, and did not prohibit Emerson from selling direct or raising the prices it charged to Universal. Thus, the actions complained of (selling direct to Great Lakes and increasing the prices charged to Universal) were acts which Defendant had a legal right to do. Based on what has been submitted by the parties, the Court agrees that Universal cannot establish that Emerson lacked justification for selling directly to Great Lakes or raising the prices it charged to Universal.

Plaintiff's response to this ground emphasizes its assertion that Emerson breached the Agreement by selling direct. As set forth above, however, the Court concludes that the plain language of the contract did not prohibit Emerson from selling direct or raising its prices. Thus, there was no breach of contract.

Moreover, the Court finds Universal's reliance on *Machine Maint*. misplaced because

that case can be easily distinguished.  In *Machine Maint*., the Court found that a reasonable jury could have found numerous improper actions on the part of the defendant.

Unlike *Machine Maint*., in this case there is no allegation that Emerson breached the contract by improperly terminating the agreement or providing insufficient notice of termination. In addition, the evidence shows that Universal already had alternate suppliers that it was using, so it was not a situation where it would have been left without any ability to fill customer orders from another supplier.  Moreover, in *Machine Maint*., the plaintiff distributor had two of its key salespeople quit and form a new distributorship.  The evidence showed that defendant improperly terminated the agreement with plaintiff so that it could use the new distributor.  There was also evidence to show that defendant was motivated by the hope that customers would be dissatisfied with plaintiff and therefore switch to the new distributor that defendant wanted to use.  There was also evidence to show that defendant, acting in concert with the two ex-sales people of plaintiff, actively contacted plaintiff's regular customers using plaintiff's sales records and urged them to deal with the new distributor rather than with plaintiff, and that some of those contacts were made even before defendant terminated plaintiff's distributorship agreement.  In sum, the facts were dramatically different than the facts presented here.  The Court fails to see how *Machine Maint*. supports Universal's claim.

C.      Universal's Claim For Violation Of Robinson-Patman Act (Count IV).

Section 2(a) fo the Robinson-Patman Act "prohibits a supplier from 'discriminat[ing] in price between different purchasers of like grade and quality' where 'the effect is substantially to lessen competition.'  15 U.S.C. § 13(a)." *Lewis v. Philip Morris Inc*., 355 F.3d 515, 521 (6th Cir. 2004).  "Although the statute refers to price discrimination, it has been interpreted to prohibit

price differences."

Emerson's first challenge to this claim is its contention that Universal's Amended Complaint fails to properly allege a violation of the Act. It contends that Plaintiff fails to allege any evidence of relevant markets. (Def.'s Br. at 16). Citing the following cases, Emerson states that in determining whether price discrimination has the necessary adverse competitive effects, there must be defined product and geographic markets: *Bathke v. Casey's Gen. Stores*, 64 F.3d 340, 344-45 (8th Cir. 1995); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002). It contends that Plaintiff's failure to allege and prove these markets requires dismissal.

Emerson also makes two other challenges to this claim, based on the evidence in the case. It contends that to establish a claim of price discrimination, a plaintiff must establish: 1) the relevant sales were made in interstate commerce; 2) the goods were of like grade and quality; 3) Emerson discriminated in price between UEP and another purchaser of Emerson products; and 4) the discrimination may injure, destroy, or prevent competition.

Emerson states that Universal indicated in discovery that the discriminatory sales were made to: 1) Great Lakes Pump, 2) Process Systems; and 3) McBroom.

Emerson asserts that Universal does not compete at the same functional level as Great Lakes and Process Systems, as required to proceed with the claim based on sales to them. It states that Universal resells motors to other buyers, including OEMs, while Great Lakes and Process Systems incorporate the motors into pump systems which they sell.

Emerson acknowledges that McBroom, like Universal, is a distributor. It claims, however, that Universal does not compete in the same geographic market as McBroom, as required to proceed with a claim based on sales to it. It relies on the testimony of Beaton,

Universal's President, to establish that Universal did not compete with McBroom for sales during the relevant time period in 2006. (Def.'s Br. at 18).

With respect to Emerson's assertion that it has failed to adequately allege the relevant markets, Universal notes that Emerson did not raise this issue before the close of discovery, and notes that courts are very hesitant to grant motions to dismiss for failure to plead a relevant product market, citing *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001). It further states that to the extent there is any deficiency, the proper procedure would be to allow Universal to amend the complaint. (*See* Pl.'s Response Br. at footnote 11).

With respect to McBroom, Universal asserts that there is some evidence that establishes at least a question of fact as to whether Universal and McBroom compete in the same geographic market. Universal's brief did not respond to Emerson's contention that the claim cannot proceed based on McBroom because Beaton testified that Universal did not compete with McBroom in 2006. Nevertheless, at oral argument, Counsel for Universal acknowledged that Universal cannot maintain its Robinson-Patman claim based upon alleged discriminatory sales to McBroom.

With respect to Emerson's assertion that Universal does not compete at the same functional level as Great Lakes and Process Systems, Universal responds that its argument is not that Emerson "cut out the middleman." Rather, it contends that Great Lakes and Process Systems received favorable pricing and Universal directly competed with them for customers with respect to sales of "loose" motors.

In its Reply, Emerson calls Beaton's affidavit stating that Universal competes with Great Lakes and Process Systems with respect to loose motors "conclusory." It does not offer any

evidence, however, to contradict that testimony.  It also states that Universal does not cite any evidence establishing that "loose sales" of motors is a product market.  It contends that the Court should not allow Universal to amend its complaint with respect to product markets because discovery has closed and re-opening it would be time consuming and expensive.

As set forth below, the Court concludes that Defendant is not entitled to summary judgment with respect to Plaintiff's Robinson-Patman claim at this time.

"Section 2(a) applies only if 'two or more consummated sales of commodities of like grade and quality are made at discriminatory prices by the same seller to two or more different purchasers contemporaneously or within the same approximate time period." *Lewis,* 355 F.3d at 521. (Internal citation omitted).  "In a secondary-line section 2(a) case, the plaintiff who is the disfavored purchaser, must show that it competes with the favored purchaser." *Id*.  "To show that the disfavored purchaser is injured, the disfavored purchaser and the favored purchaser must be in the same geographic market." *Id.*

Thus, under *Lewis,* Universal must show that it competes with McBroom, the alleged favored customer and that McBroom *and* Universal are in the same geographic region.  With respect to McBroom, however, Beaton testified that Universal did not compete with McBroom during the relevant time period of 2006 (Beaton Tr. at 102) and Plaintiff's counsel acknowledged at oral argument that this claim therefore cannot be based upon alleged sales to McBroom.

Nevertheless, Universal also bases its Robinson-Patman claim on alleged discriminatory sales to Great Lakes and Process Systems.  Universal has submitted evidence to establish that it competes with those companies with respect to sales of loose motors.  Neither side has established whether sales of loose motors is or is not considered a product market.  Moreover,

Universal has requested that it be allowed to amend its complaint as it relates to product markets.

The Court concludes that it should allow Plaintiff to amend its complaint to adequately allege the product markets. If additional discovery is necessary, the Court anticipates it would not entail more than a few limited depositions. Accordingly, the Court shall deny, without prejudice, Emerson's request for summary judgment as to Universal's Robinson-Patman claim. The Court shall allow Plaintiff to amend its complaint as it relates to product markets. **Such an amended complaint must be filed within 14 days of the date of this order.**

If either party believes that it requires additional discovery following the filing of the amended complaint, the Court urges the parties to meet and confer in order to agree to the scope and timing of that *limited* discovery, in which case the parties should submit a proposed stipulation and order regarding same. If the parties cannot so agree, or the Court does not approve of the stipulation and order submitted by the parties, the Court shall schedule a status conference to discuss these issues with the parties.

II.  Emerson's Motion For Partial Summary Judgment Seeking Summary Judgment As To Its Action On Account And Breach Of Consignment Agreement Counterclaims.

Emerson has asserted the following three counterclaims against Universal: "Breach of Contract - the Agreement" (Count I); "Open Account" (Count II); and "Breach of Contract - Consignment Agreement" (Count III). (*See* Docket Entry No. 19).

In its Breach of Contract claim, Emerson alleges that Universal breached the 1990 Distributorship Agreement by failing to comply with its payment terms and failing to actively and aggressively promote the sale of Emerson's products. (Counterclaim at ¶¶ 30-31). Similarly, Emerson's "Open Account" claim alleges that Emerson furnished product to Universal

and that Universal has failed to pay for that product. (Counterclaim at ¶¶ 34-40).

Emerson's third counterclaim alleges that Universal breached consignment agreements with it.

A.     Emerson's Action On Account Counterclaim.

In its Motion for Partial Summary Judgment, Emerson contends that it is entitled to summary judgment on its Open Account counterclaim. It states that under Missouri law, the elements of an action on open account are: 1) the defendant requested plaintiff to furnish good or services; 2) plaintiff accepted the offer by furnishing the good; and 3) the charges were reasonable. *Midwestern Health Mgmt. v. Walker*, 208 S.W.2d 295, 297-98 (Mo. Ct. App. 2006). Emerson contends that Universal owes it $201,708.22 for product it shipped to Universal that it accepted but has not yet paid for.

Emerson also asserts that "under the plain terms of the Agreement, UEP is liable for all expenses, including attorneys' fees, relating to collection of past due amounts. It supports that assertion, however, not by the terms of the Agreement, but rather by referencing Emerson's standard Terms and Conditions of Sale. (Emerson Terms and Conditions of Sale, ¶ 3.).

Universal maintains that it has never disputed that it owes Emerson $201,708.22 for goods shipped. It contends it has not paid the amount because Emerson committed a first material breach of the contract by selling directly to its customers and by raising its prices.

Universal contends that Emerson is not entitled to attorney fees because its purchase order terms and conditions added the term relating to attorneys fees and therefore does not apply. It also maintains that even if the term applied, Emerson would not be entitled to any attorney fees because it has never disputed that it owes the $201,708.22 and therefore Emerson's attorney fees

on this claim would be zero. It claims that Emerson's legal fees in this case were incurred with respect to defending Universal's breach of contract, tortious interference and Robinson-Patman Act claims.

The Court agrees that partial summary judgment in favor of Emerson is appropriate. There is no dispute that Universal owes the $201,708.22 at issue. Moreover, as noted above, the Court concludes that Plaintiff's breach of contract fails and therefore Plaintiff's position that Emerson committed the first material breach also fails. Thus, Universal owes the money to Emerson.

With respect to Emerson's request for attorney fees, the Court concludes that Emerson has not established that it is entitled to the fees it seeks. As Emerson's counsel acknowledged at oral argument, we are not dealing with a situation wherein the parties' written contract contains a general attorney fee provision that lets the prevailing party recover its fees over any dispute. Moreover, the Court agrees with Plaintiff that Emerson has incurred little or no attorney fees in its attempt to recover the amount owed for product because Universal has not disputed the amount owed. Thus, the Court denies Emerson's request for attorney fees.

      B.     <u>Emerson's Breach Of Consignment Agreement Counterclaim.</u>

Emerson contends that Universal owes it $64,835.41 for consigned goods that Universal failed to return to Emerson and $9,630.15 in repair costs on some goods that it did return to Emerson, for a total of $74,465.56 for this claim. Thus, Emerson seeks $74,465.56 on its breach of consignment agreement claim.

Universal acknowledges that it owes Emerson $64,835.41 for unreturned consigned goods. It disputes, however, that it owes $9,530.15 because it returned consigned goods in a

condition other than "as new." To support this claim, Universal submits Beaton's affidavit (Ex. 2 to its Response Br.) wherein he states that the product returned to Emerson was in "as new" condition and any damage must have occurred after it was returned.

The Court concludes that Beaton's affidavit creates a genuine issue of fact as to whether some product was "as new" when it was returned. Moreover, at oral argument, Emerson's counsel acknowledged that the affidavit creates an issue of fact. Thus, although there is no dispute that Universal owes Emerson $64,835.41 for unreturned consigned goods, there is a question of fact as to whether Universal owes $9,530.15 for returned consigned goods due to their condition upon being returned to Emerson.

In Conclusion, as to Emerson's Motion for Partial Summary Judgment, the Court shall grant the motion in part and deny the motion in part. The motion shall be granted to the extent that the Court will rule that Universal owes Emerson the following amounts: 1) $201,708.22 for product that it received (Count II, Open Account claim); and 2) $64,835.41 for unreturned consigned goods (Count III, Breach of Consignment Agreement claim). The motion shall be denied with respect to Emerson's request for attorney fees. The motion shall also be denied with respect to Emerson's request for $9,530.15 for returned consigned goods because there is an issue of fact as to their condition upon being returned.

III.    <u>Universal's Motion Regarding Law Applicable To Its Request For Punitive Damages</u>.

In this motion, Universal states that it will seek punitive damages if it prevails on the merits of the claims in its complaint. It concedes that punitive damages are generally not recoverable under Michigan law. It asserts, however, that punitive damages are available for tortious interference with a contractual relationship or business expectancy and for breach of

contract under Missouri law, and that Missouri law applies to Plaintiff's tort and contract claims in this case.

As set forth above, the Court is granting summary judgment in favor of Emerson with respect to Plaintiff's tort and contract claims. Thus, Plaintiff's only remaining claim is the Robinson-Patman claim.

At oral argument, Counsel for Universal confirmed that Universal intends to seek punitive damages with respect to the tort and contract claims only. That is, counsel confirmed that Universal is not seeking punitive damages with respect to the Robinson-Patman claim.

Accordingly, Plaintiff's motion for clarification is moot and need not be analyzed by the Court. The Court shall therefore deny that motion as moot.

CONCLUSION & ORDER

For the reasons above, IT IS ORDERED that Emerson's Motion for Summary Judgment seeking dismissal of Universal's claims (Docket Entry Nos. 63 & 64) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to Universal's breach of contract and tort claims and those claims are DISMISSED WITH PREJUDICE. The motion is denied in all other respects. IT IS FURTHER ORDERED that Universal may amend its Robinson-Patman claim, to properly allege the product market at issue, **within 14 days of this order.**

IT IS FURTHER ORDERED that Emerson's Motion for Partial Summary Judgment seeking summary judgment on two of its counterclaims (Docket Entry No. 65) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED in that the Court hereby rules that Emerson is owed the following amounts from Universal: 1) $201,708.22 for product that it

received (Count II, Open Account claim); and 2) $64,835.41 for unreturned consigned goods (Count III, Breach of Consignment Agreement claim). The motion is DENIED in all other respects.

IT IS FURTHER ORDERED that Universal's "Motion to Clarify the Applicable Law that Shall Govern Plaintiff's Claim for Recovery of Punitive Damages" (Docket Entry No. 61) is DENIED AS MOOT.

IT IS SO ORDERED.


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: April 8, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 8, 2008, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager